Dirigo Tool Co. *v.* Woodruff.

THE DIRIGO TOOL COMPANY, appellant,

*v.*

PHILEMON WOODRUFF et al., respondents.

1. The Converse Manufacturing Company gave to Woodruff, a creditor, a paper acknowledging that they had pledged to him certain chattels in their factory. One Beers, the superintendent of the Converse Company, was requested, and assented, to hold possession of the chattels for the pledgee.

2. The chattels remained in the factory, and the superintendent exercised the same control over them after as he had before the alleged pledging. Subsequently, the Dirigo Tool Company, without knowledge of the transaction, and, having been informed by Beers that there were no liens upon the chattels, took a mortgage upon them to secure a debt and loan.—*Held*, that no lien, by way of pledge, could be set 'up by Woodruff against the mortgage.

On appeal from a decree advised by W. B. Williams, Esq., advisory master, who filed the following conclusions :

1. Converse, for his company, agreed, on the evening of March 31st, 1885, to pledge the property in question to Woodruff.

The attempt of Converse and Beers to explain away the action and papers of March 30th and 31st are opposed to probability, and, at any rate, cannot prevail against the written evidence.

2. Woodruff took possession as pledgee, on the morning of April 1st; the possession taken was sufficient in law to complete the pledge.

3. Woodruff lawfully employed Beers to maintain his possession, and it was so maintained until and after the giving of the complainants' mortgage.

The result is that there was a valid pledge as against the complainants.

4. The other question discussed was that of estoppel.    There was no estoppel against Woodruff by his own acts or omissions.

The pledge was not concealed by him.

When it was made, and when Huntington conversed with him on April 4th, all parties supposed that money enough was to be raised to pay all claims; there was nothing then to suggest the necessity of mentioning specially the pledge, and no questions were asked which would suggest to Mr. Woodruff any such necessity.    He knew that Converse knew of the pledge, and that Huntington was in full communication with Converse.

I see no ground to impute any concealment to Mr. Woodruff.

There is no estoppel by reason of what Beers said or did. The action of Beers on April 1st, when Huntington came to take the inventory, was not fraudulent, but was consistent with the then belief of all, that money enough would be raised to pay all.

Beers's statements to Mr. Huntington on the 10th, when they came to get the mortgage executed, were a fraud on Huntington, and so was Converse's silence as to the pledge; but the fraud was theirs, and not Woodruff's.

Beers was knowingly violating his instructions in making such statements, and was doing it with intent to deceive Huntington.

An agent's deceit, contrary to instructions, will not be imputed to the principal who neither adopts nor profits by the fraud.

The title under the pledge must, in my opinion, be maintained.

The property having been sold by consent of parties, and enough of the proceeds deposited in court to answer Woodruff's claims, a decree will be advised that his claims be paid out of that fund, with costs, and the surplus, if any, paid to the complainants.

*Mr. Charles W. Kimball,* for appellant.

*Mr. Philemon Woodruff,* for respondents.

Dirigo Tool Co. *v.* Woodruff.

The opinion of the court was delivered by

REED, J.

The bill in this case was filed to foreclose a mortgage of certain machinery, tools and manufactured stock in the shops of the Converse Manufacturing Company, in the city of Newark. The chattel mortgage was made on the 10th day of April, 1885, by the Converse Manufacturing Company to the Dirigo Tool Company, to secure the payment of the sum of $5,764 on demand.

Neither the legal execution of this instrument, nor the fact that the amount stated therein was loaned in good faith, are the subject matters of contention.

The point litigated is whether another person had already obtained a lien upon these chattels, which lien was superior to that of the Dirigo Tool Company, claiming as mortgagees under this chattel mortgage.

It is claimed, on the part of the respondents, that the chattels mortgaged were, at the time when the mortgage was executed, already in pledge to him to secure the payment of three debts due from the pledgors to other persons, and which were in the hands of the pledgee for collection.

The chattel mortgage was made on the 10th of April, 1885, and the transaction which is relied upon as evidence of a pledge occurred on March 31st, 1885. Previous to either of these dates, the Converse Manufacturing Company had borrowed, through Mr. Woodruff, the respondent, the sum of $1,500, which was secured by a note, payable at the Yonkers Bank, and a chattel mortgage made to another Mr. Woodruff. Afterward, there came to the hands of Mr. Woodruff for collection, he being an attorney, three other claims against the Converse Manufacturing Company. For the collection of two of these claims he prepared writs of attachment, which were not served by reason of an arrangement to turn over property of the company as security.

After considerable negotiation between Mr. Woodruff and Mr. Converse, president of the company, the following paper was delivered to Mr. Woodruff:

Dirigo Tool Co. *v.* Woodruff.

"NEWARK, N. J., March.31st, 1885.

"Received from the Converse Manufacturing Company, all the goods and chattels mentioned in the chattel mortgage made by them to Frederick Woodruff, with such other goods and chattels as has been added to the machinery and stock on the two floors of the building occupied by the said company, at Nos. 211 and 213 Mulberry street, the same to be held by me as security for the payment of the following sums of money until Saturday, the 11th day of April next, after which date they are to be sold for the payment of said sums. First, the sum of $338.49, due B. Atha & Co.; second, the sum of $42.72, due George Havell; third, the sum of $1,160.29, due S. J. Meeker.  Proceeds of said sale to be applied in the above order.

"PHILEMON WOODRUFF.
"THE CONVERSE MANUFACTURING COMPANY,
"Per M. D. Converse, President."

The execution of this instrument by their president was approved at a meeting of the board of trustees of the company.

After the execution of this paper, Mr. Beers, the superintendent of the works of the Converse Manufacturing Company, was left in possession as the agent of Mr. Woodruff.

It may be remarked that before Mr. Woodruff had received the claims of Havel and Meeker, but had in his hands the claim of Atha & Co. for $338.49 only, Beers had, by direction of Mr. Converse, agreed to turn over to Mr. Woodruff, as security for the Atha claim, six hundred nail-pullers, and a number of these were carried down-stairs into a room separated from the larger room by a board partition.  This appears to have occurred on the 30th, and on the succeeding day the arrangement to place all the stock in pledge for all the debts was effected.

The financial position of the Converse company at this time was critical.  The note secured by the chattel mortgage to Frederick Woodruff for $1,500 would mature in a few days; another note in the Yonkers bank for $400 was in the same situation; all the machinery and stock of the company were liable to be sold any time after the 7th day of April for the three claims held by Woodruff; the Converse company had already applied to the Dirigo Tool Company for a loan to be secured by a chattel mortgage.  They were under a contract to furnish the Dirigo Tool Company with nail-pullers, and the latter company was interested in having the contract executed.  The Dirigo

company had previously loaned to the Converse company considerable money, which was still unpaid. The former company hesitated for some time to increase the amount of the indebtedness, but finally concluded to do so if satisfactory security could be given. A chattel mortgage was proposed to be given upon the manufactured goods and the tools and machinery in the factory of the Converse company. A part of the moneys to be advanced under this arrangement was to be used in satisfying the pre-existing chattel mortgage given to Mr. Woodruff to secure the payment of $1,500.

In the course of the negotiation which led to the execution of the new chattel mortgage, the Dirigo company sent its attorney, Mr. Huntington, over to Newark to inquire into the condition of the property of the Converse company in respect to the security which the proposed chattel mortgage would afford the lenders. He went over on April 2d. It is to be kept in view that the paper relied upon as evidence of the pledge to Mr. Woodruff had been executed two days before, and Beers, the superintendent of the Converse company, according to the testimony of Mr. Woodruff, had already agreed to hold possession of the chattels as the agent of the pledgee.

With Mr. Huntington, on the 2d of April, went Mr. Fuller, the treasurer of the Dirigo Tool Company. They were to have met Mr. Converse, the president of the Converse company, at the factory, but he was not there upon their arrival. They knocked at the door, and it was opened by Beers, who told them that he was the superintendent. Mr. Huntington told him that he wished to make a thorough inventory of their stock of goods; that the Dirigo company proposed to make a loan upon it, and he wished to know about it.

Mr. Beers replied that he supposed that he could tell more than any one else, as he had been the superintendent of the company from the beginning. Mr. Beers went through the building with them, showed them the manufactured nail-pullers up-stairs and down-stairs, and an inventory was taken.

Mr. Huntington afterward, on the 4th of April, had an interview with Mr. Woodruff, in which Mr. Woodruff agreed, in

view of the prospect of this loan, not to proceed against the property under the chattel mortgage, which he already held, until Saturday following.

On the 10th of April (the Dirigo company having consented to advance $1,800, and take a mortgage for the entire amount of their indebtedness) Mr. Huntington came, with the money, to Newark; but, as an additional precaution, went to the factory and looked all over the place, and asked Mr. Beers, the superintendent, if there was any attachment, or any other lien upon the property. He replied that there was nothing of the kind upon the premises.

Then the chattel mortgage was drawn up and executed, after Mr. Huntington had searched for other mortgages, and found none, except the pre-existing $1,500 one, which was to be paid out of the new loan. He then proceeded to pay the amount to be advanced in the manner already agreed upon. He paid off the former mortgage. He paid the $400 note in the bank at Yonkers. He paid $133 to a Mr. Mott.

This left the three claims in the hands of Mr. Woodruff unpaid, and, as soon as he learned of the execution of the mortgage, he took possession of the chattels. The Dirigo company then filed this bill for an injunction restraining the sale of them, as pledged for an account of the amount due upon the chattel mortgage, and for a decree that the chattel mortgage be declared paramount to any lien arising from the alleged pledging of the chattels, and for the appointment of a receiver. Subsequently, it was agreed between the solicitors of the respective parties that the chattels should be sold, and (with the exception of a few, the sale of which had been enjoined) they were sold for the sum of $2,650. This sum being in excess of the amount due the pledgee, the sum of $2,000 was paid into court, and the balance credited upon the chattel mortgage of the complainant.

The contest now is whether the money in court shall be applied first to the payment of the claims held by Mr. Woodruff, or shall be applied to the payment of the chattel mortgage. And the solution of this question is dependent upon the validity of the transaction on March 31st, as creating a lien by way of

pledge, which is superior to the lien of the chattel mortgage executed on April 10th following. The advisory master, who heard the cause below, concluded that the chattels were held in pledge, and that the proceeds of sale must be first applied to the claims in the hands of Mr. Woodruff.

The decree appealed from was made in conformity with that conclusion.

It seems to me that in any view in which the case can be regarded, the mortgagees did not receive the full measure of their right.

They were clearly in a position at least to be subrogated to the place which Frederick Woodruff occupied under his mortgage, which was a subsisting encumbrance at the time the alleged pledging occurred. The money was paid by the Dirigo company to liquidate that mortgage, and it was paid with the clear understanding that the new mortgage was to include the amount so paid. Mr. Woodruff knew of the arrangement, and received the money in payment of Frederick's mortgage; it would be inequitable to permit him, as the solicitor of the other claimants, to stand in a better position, by reason of such payment, than he occupied at the time of the pledging, to the injury of these complainants. It is, however, not important to pursue the inquiry in respect to complainant's position in this respect, for I think the position of the complainant is broader than that of one standing in the steps of the previous mortgagee. I think that under the mortgage of April 10th he stands in a position to successfully resist the claim that the lien of the defendants is superior to his mortgage in any degree.

The essential feature in a pledging is a delivery of the article bailed.

The right of the pledgee rests not upon title, for that remains in the pledgor, but upon possession.

This strict requirement is designed not only as evidence of the contract of bailment, but as a monition to persons dealing with the property. Possession is *prima facie* title, and those who deal, concerning property, with a person other than he who has it in possession are put upon inquiry to ascertain by what right

Dirigo Tool Co. v. Woodruff.

another holds the custody. It is true that possession may pass without actual tradition of the property. Chattels may be of a character which would render th¹s impossible or impracticable, or the course of mercantile transaction may have adopted a symbol, the possession of which is the evidence of possession of property. The delivery of a bill of lading or a warehouse receipt is a delivery of the property. The delivery of the key of a building containing goods is a delivery of goods, as it passes from one to another the power to reach and control them. So cumbersome property as a raft may be delivered without a physical change of *situs*.

Nor can it be doubted that it is the law that chattels once delivered may be returned to the pledgor for a temporary or special purpose without destroying the lien of the pledgee.

But that there must be first a delivery of possession to establish a pledge is elementary law. The character of this delivery must be dependent upon the circumstances which surround each transaction. In view of the purpose which the requirement of a change of possession is designed to accomplish, and in the light of the legislative policy manifested in our statute concerning chattel mortgages, it seems clear that such change of possession should be as noticeable as the nature of the transaction will reasonably permit.

Under our statute, nothing short of a registration or an actual and continued change of possession will operate to create a lien by way of mortgage. While the provisions of this statute are not applicable to pledges, still they display a clear legislative policy in opposition to the creation of secret liens upon personal property. If the transaction now claimed to be a pledge created a lien good against the world, I see no occasion for any creditor to resort to the publicity of the chattel mortgage act to obtain security for his debt.

The chattels pledged, as we have seen, consisted of the machinery and tools used in the manufacture of tools, and of the manufactured goods. They were, before the alleged pledging, in the factory of the owners. After the alleged pledging, they were still in the factory of the owners.

Before and after March 31st, the owners had complete and exclusive possession of the factory and control over the contents of the factory.

But it is said that Beers was there, and he had promised to hold possession of the chattels for the pledgee. Beers was and had been the superintendent of the owners. In exercising control over the operations of the factory, of its machinery and of its products, he was probably the most conspicuous representative of the company. . The pledgee left the company in possession without any visible change in the position of the chattels. The pledgee left the chattels in the very position calculated to lead any person dealing with them to the belief that the Converse company held towards them the same relation it had always held.

While this condition of things existed, Beers asserted to the agent of the complainant that there was no lien upon the chattels, and upon the faith induced by that assertion, and of what he saw, the complainants made their loan and took their mortgage. The defendant is responsible for the condition of affairs and the occurrences which misled the complainants.

The selection of Beers, occupying the place he did, was such as to impose upon the pledgee responsibility for his conduct. He was placed where his words were in accordance with his surroundings and his interests.

There were no means for a creditor or purchaser to ascertain the true posture of affairs by any visible feature, and the person selected by the pledgee to represent him, instead of asserting, repudiated his claim to possession. His well known position as superintendent for the complainants gave force to his words. I think that the respondent is not in a position to defeat the complainants' lien, which was made permissible by the conditions of fact which the former allowed to exist. The decree below should be reversed, and the money in court should be first applied to the payment of the amount secured by the chattel mortgage.

*Decree unanimously reversed.*